**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| KALKEYLIUSS HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 19 CV 5878 |
| | ) | |
| The CITY OF CHICAGO, a municipal | ) | Judge ROWLAND |
| Corporation, Chicago Police Chief BARBARA | ) | |
| WEST, Director of Human Resources ROBERT | ) | Magistrate Judge COX |
| LANDOWSKI, and former Chief | ) | |
| Communications Officer ANTHONY | ) | |
| GUGLIELMI, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, KALKEYLIUSS HARRIS, by his attorneys, the HAMILTON LAW OFFICE,

LLC, makes the following first amended complaint against Defendants the CITY OF CHICAGO

("Defendant CITY"), Chicago Police Chief BARBARA WEST ("Defendant WEST"), Director of

Human Resources ROBERT LANDOWSKI ("Defendant LANDOWSKI"), and former Chief of

Communications Officer ANTHONY GUGLIELMI (Defendant "GUGLIELMI") (jointly referred

to as the "INDIVIDUAL DEFENDANTS"):

**JURISDICTION and VENUE**

1. This case is brought pursuant to 42 U.S.C. §§1983 and 12101 et seq. and 740 ILCS 174/15(b)

   and 20.1 to redress the deprivation under color of law Plaintiff's rights as secured by the United

   States Constitution, the Americans With Disabilities Act, and the Illinois Whistleblower Act.

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§1331, 1343, and 1367. Notice

   of a right to sue was provided to Plaintiff on June 13, 2019 by the Equal Employment

   Opportunity Commission (EEOC).

3. Venue is proper under 28 U.S.C. §1391(b). All parties reside in this judicial district and the

events giving rise to the claims asserted in this complaint occurred within this district.

**PARTIES**

4.  KALKEYLIUSS HARRIS ("Harris") is a resident of Chicago, Illinois and a Chicago police officer.

5.  At all relevant times, Defendant WEST is or was a Chicago Police Officer, employed by Defendant CITY, acting under color of law and within the scope of her employment.

6.  At all relevant times, Defendant LANDOWSKI is or was employed by Defendant CITY as the Director of Human Resources of the Chicago Police Department, acting under color of law and within the scope of his employment.

7.  Defendant GUGLIELMI is or was employed by Defendant CITY as the head of CPD's Office of News Affairs, and CPD's Chief Communications Officer. At all relevant times, Defendant GUGLIELMI was acting under color of law and within the scope of his employment. Defendant GUGLIELMI has since resigned his position in the Office of News Affairs.

8.  Defendant CITY is a municipal corporation, duly incorporated under the laws of the State of Illinois, and at all relevant times was the employer and principal of the INDIVIDUAL DEFENDANTS. Should Plaintiff prevail on his claims, Defendant CITY must indemnify the INDIVIDUAL DEFENDANTS pursuant to 745 ILCS 10/9-102.

9.  Defendant CITY is Harris's employer as defined under the Americans With Disabilities Act and the Illinois Whistleblower Act.

**FACTS**

10. Harris is 46 years old and a lifetime resident of the city of Chicago.

11. Harris became a Chicago police officer in May 2001 and has been a member of the Chicago Police Department ("CPD") for over 19 years.

12. Throughout his career with CPD, Harris has been assigned or detailed to various specialized

units including, the gang unit, special operations, various tactical teams, and the narcotics unit.

13. In approximately March of 2014 Harris was assigned to the narcotics unit, where he excelled.

**HARRIS is Discriminated Against for Seeking Psychological Help**

14. In early 2017, Harris was under a significant amount stress as a result of personal issues.

15. With the assistance of Defendant CITY's Employee Assistance Program ("EAP"), Harris went on medical leave and checked into a treatment facility in Utah in March 2017.

16. In April 2017 Harris returned home and continued with outpatient treatment at Defendant CITY's request.

17. In September 2017 Harris was medically cleared to return to work by Defendant CITY. This process required Harris to undergo psychological and physical screenings by doctors of Defendant CITY's choosing.

18. In September 2017 Harris returned to the narcotics unit, under a new commander, Ronald Kimble.

19. Upon learning of the reason for Harris's absence, Commander Kimble removed Harris from the narcotics unit against Harris's wishes.

20. Harris was then briefly reassigned to the Gang Intelligence Unit. Shortly after being reassigned to the Gang unit, however, his Commander, Christopher Kennedy, called him into a meeting and expressed concerns about Harris's mental health.

21. In February of 2018, Harris was re-assigned to patrol where he had started his career many years before.

22. When a police officer is removed from a specialized unit and re-assigned to the patrol division against his or her wishes that is considered in CPD to be an adverse and negative personnel decision.

23. Within the culture of CPD, the term that is used for a re-assignment such as the one that was

ordered for Harris is that he was "dumped" back to patrol.

24. Harris was and still is able to perform the essential functions of a police officer assigned to the narcotics unit.

25. Harris was a disabled person or, in the alternative, was perceived by Defendant CITY to be a disabled person as this term is defined in the ADA as he was a qualified individual with a disability and/or was perceived by his employer as unable to perform the duties of his position and was re-assigned based upon this perception.

**HARRIS is Retaliated Against for Disclosing CPD's**
**Discrimination Against Officers Who Seek Mental Health Care**

26. On September 3, 2018, then CPD Superintendent Eddie Johnson sent out a department-wide email regarding officer mental health after a second CPD officer in three months had committed suicide.

27. Superintendent Johnson's email urged CPD members to seek help from EAP if they were experiencing difficulty dealing with personal or job-related stress.

28. On September 4, 2018, Harris sent an email to Superintendent Johnson and other members of CPD command staff, including Defendant WEST, responding to Superintendent Johnson's email.

29. Harris's email disclosed that he received assistance from EAP for alcoholism and, instead of being supported, the Department discriminated against him by removing him from his position and re-assigning him to patrol.

30. That same day, Defendant WEST forwarded Harris's email to Defendant LANDOWSKI.

31. Harris met with an EAP clinician on September 5, 2018 and September 10, 2018.

32. At both meetings, the EAP clinician had a copy of Harris's September 4, 2018 email.

33. The EAP clinician did not express any concern about Harris's mental fitness for duty at either appointment.

34. In early September 2018 Harris also spoke with a reporter from a local news outlet who was interested in airing a story about police officer mental health issues and their reluctance to seek treatment.

35. On September 13, 2018 Harris sent an email to CPD's Office of News Affairs requesting permission to participate in a news interview to raise awareness for officers who are suffering emotionally and afraid to seek help.

36. Within 10 minutes of receiving Harris's email, a City employee in the Office of News Affairs forwarded Harris's email to Defendant GUGLIELMI.

37. On information and belief, Defendant GUGLIELMI informed Defendant LANDOWSKI, WEST, or other CPD personnel about Harris's disclosures to the media and his request to cooperate in a news story.

38. Later, on the same day that Harris sent his email to the Office of News Affairs, Defendant LANDOWSKI sent a memorandum to Harris's commander ordering Harris to undergo a mandatory fitness for duty evaluation.

39. As part of this mandatory fitness for duty evaluation, Harris was stripped of his police powers on September 17, 2018.

40. Being stripped of your police powers is considered within CPD to be an adverse and negative personnel decision.

41. Harris was again evaluated by physicians of Defendant CITY's choosing and he was again cleared physically and mentally and returned to work on November 2, 2018.

42. The mental health of Defendant CITY's police officers is a matter of great public concern.

43. By speaking out about CPD's discrimination against officers who seek mental health and/or alcoholism treatment, Harris was speaking as a private citizen of the city of Chicago.

44. Harris was protecting the public interest by attempting to shed light on CPD's failure to ensure

its officers are not deterred from seeking mental health assistance when they need it. The entire city of Chicago is a safer place when its police officers are mentally fit.

45. In sending the September emails and talking to a member of the media, Harris was also disclosing what he reasonably believed was a violation of state and/or federal law to a local government agency.

46. In sending the September emails and talking to a member of the media, Harris was attempting to and did disclose public wrongdoing.

### Defendant CITY's Unwritten Policy of Punishing Officers Who Get Mental Health Treatment

47. The Chicago City council has long been aware of the regulatory and supervisory failures plaguing the Chicago Police Department's handling of officer mental health. Since at least January 2017, the Chicago City council knew the Chicago Police Department's suicide rate was exponentially higher than the national average.

48. The United States Department of Justice ("DOJ") undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

49. The DOJ reported concluded that officer wellness is not an integral part of CPD's operations and that CPD does not have an overarching officer-wellness plan.

50. The report noted that "[w]ithout prioritizing and planning for officer wellness, officers receive the message from leadership that officer wellness is not valued, which discourages officers who want to succeed but feel overburdened and unsupported in that goal."

51. CPD officers reported being hesitant to seek counseling through EAP because it is seen as a sign of weakness.

52. The City discourages its officers from getting help by allowing officers who do get helped to get transferred out of assignments or passed over for coveted positions within the CPD.

53. The City in policy and practice discourages and punishes its officers for speaking to the press or

criticizing the Chicago Police Department's practices publicly.

54. One such example is former Chicago Police Officer Brian Warner ("Warner").

55. In 2011, Warner was involved in a shootout with an armed suspect that ended in the suspect losing his life.

56. Warner did not feel supported by the Department or EAP and so he sought outside counseling.

57. When Warner was outspoken about CPD's shortcomings regarding officer mental health, he was fired for the shooting despite being given the department's highest honor for the same shooting two years earlier.

58. The DOJ report found that officers are equally hesitant to contact EAP on behalf of a coworker for fear of being labeled or seen as "rats."

59. This lack of support and punishment of officers who do want mental health treatment creates tragic results.

60. One CPD official told DOJ investigators that CPD's suicide rate is 22.7 suicides per 100,000 department members.

61. The FOP shared figures with DOJ investigators showing that CPD's suicide rate between 2013 and 2015 was 29.4 suicides per 100,000 department members. "This would mean that CPD's officer suicide rate is more than 60% higher than the national average of 18.1 law enforcement suicides per 100,000."

62. The DOJ recommended that CPD "reinforce the value of wellness and support a culture that encourages officers to seek assistance when needed. CPD can then better prepare its officers for success, which in turn, will help prevent officers from posing harm to themselves and the communities they serve."

63. This recommendation was made to CPD in the DOJ report on January 13, 2017.

64. Despite this notice, when HARRIS returned to work after seeking mental health treatment, he

was removed from a coveted position in a specialized unit and dumped back to the patrol

division specifically because he disclosed his treatment and disability.

## COUNT I
### (42 U.S.C. §1983, First Amendment Retaliation Claim)

65. Each of the preceding paragraphs is re-alleged as if fully restated here.

66. As described above, Harris engaged in activity protected by the First Amendment when he

disclosed Defendant CITY's retaliation and discrimination against himself and other CPD

officers who utilize EAP's services.

67. As described above, Harris engaged in activity protected by the First Amendment when he

spoke to the media and to the leaders of the CPD about his own, and other officers' experiences

of retaliation and discrimination for utilizing EAP services.

68. Harris's speech involved a matter of great public concern: the mental health of police officers

and their reluctance to get necessary mental health treatment for fear of negative impacts to their

CPD careers.

69. Defendants' attempts to silence Harris by stripping him of his police powers deters him and

others from exercising their First Amendment rights and duties in disclosing retaliation and/or

discrimination.

70. Harris's First Amendment activity concerning his disclosure of Defendant CITY's retaliation

and discrimination was a motivating factor in Defendants decision to strip Harris of his police

powers.

71. As a direct and proximate result of Defendants' misconduct, Harris suffered damages, including

financial, emotional, and damages to his reputation, which will be proven at trial.

**WHEREFORE**, Harris prays for a judgment against Defendants in a fair and just amount

sufficient to compensate him for his damages, plus punitive damages, as well as court costs,

attorney's fees, and such other relief as is just and equitable.

## COUNT II
(42 U.S.C. §12101, et seq., American With Disabilities Act)

72. Each of the preceding paragraphs is re-alleged as if fully restated here.

73. The ADA protects individuals who have disabilities and also those who are incorrectly "regarded as" or perceived to have disabilities. 42 U.S.C. Section 12102(3)(A).

74. Harris suffers from alcoholism and is thus disabled under the ADA.

75. In the alternative, Defendant CITY regarded Harris as "disabled."

76. Harris is and was qualified to perform the essential functions of a Chicago police officer assigned to the narcotics unit.

77. Defendant CITY discriminated against Harris on account of his actual or a perceived disability by dumping him back to patrol.

78. Defendant CITY would not have transferred Harris if he were not disabled, or, in the alternative, if Defendant CITY had not erroneously perceived Harris as disabled.

79. When it transferred Harris because of his disability, or, in the alternative, his perceived disability, Defendant CITY took an adverse job action against him, thus violating the ADA.

**WHEREFORE**, Harris prays for judgment against Defendant CITY in a fair and just amount sufficient to compensate Harris for the damages he has suffered, as well as costs and attorneys' fees pursuant to 42 U.S.C. § 12205, and such other relief as is just and equitable.

## COUNT III
(740 ILCS 174/15(b) and 20.1, Illinois Whistleblower Act)

80. Each of the preceding paragraphs is re-alleged as if fully restated here.

81. Defendant CITY is Harris's "employer" as defined by the Illinois Whistleblower Act.

82. As more fully described above, Defendant CITY retaliated against Harris for his disclosure of discrimination against him for his disability and for his utilizing Defendant CITY's EAP, which Harris had reasonable cause to believe violated State and federal law, rules, or regulations.

83. As more fully described above, Defendant CITY retaliated against Harris for his attempt to disclose and actual disclosure of public wrongdoing.

84. Harris suffered retaliation for disclosing matters of public wrongdoing: Chicago police department personnel discriminating against members who seek help from Defendant CITY's EAP.

85. As a result of this retaliation, Harris has suffered damages.

    **WHEREFORE**, Harris prays for a judgment against Defendant CITY granting Harris:

    A. Reinstatement in a similar unit;

    B. Back Pay with interest;

    C. The cost of any lost benefits during the time he was stripped of his police powers;

    D. Emotional damages;

    E. Compensation for litigation costs, expert witness fees, and reasonable attorneys' fees;

    F. Compensation for any other damages sustained and any other relief as is just and equitable.

**COUNT IV**
(*Monell* Claim)

86. Each of the preceding paragraphs is re-alleged as if fully restated here.

87. The misconduct of City employees alleged above was undertaken pursuant to the policy and practice of the Defendant CITY of Chicago.

88. As a matter of both policy and practice, Defendant CITY encourages the type of police misconduct at issue in this case by failing to support and provide sufficient protection for officers who do seek mental health and/or addiction treatment to prevent them from being punished for doing so by transfers or other negative employment actions taken as a result of the officer seeking mental health treatment.

89. The following of Defendant CITY's policies and persistent widespread customs and practices

were the driving force behind the City employee misconduct alleged above and caused serious

harm to Harris:

   a.   The CITY allows and fosters a "code of silence" in the Chicago police department
        where officers do not report concerns about fellow officers' mental health out of
        fear of retaliation.

   b.   The CITY allows and fosters a "code of silence" in the Chicago police department
        where members are retaliated against and punished for speaking to the press or
        criticizing CPD's practices publicly.

   c.   The CITY allows and fosters an atmosphere in the Chicago Police Department
        where seeking mental health and/or substance abuse treatment is seen as a sign of
        weakness.

   d.   The CITY allows and fosters an atmosphere where officers who do get mental
        health and/or substance abuse help get transferred out of assignments or passed
        over for coveted positions in the department.

   e.   The CITY fails to train, supervise or discipline its supervising officers in a manner
        that would encourage CPD officers to seek needed mental health treatment. For
        example, the CITY allows its supervisors to impose negative employment
        consequences upon officers who seek mental health treatment with no consequences
        for this type of retaliation.

90. These policies, practices, or customs of Defendant CITY individually and collectively have

   been maintained and/or implemented with deliberate indifference by Defendant CITY,

   encouraging and allowing CPD employees to commit the wrongful acts against Harris, and

   therefore, the CITY acted as the direct and proximate cause of the injuries sustained by

   Harris.

91. These policies, practices, and customs of Defendant CITY, individually and/or collectively,

   were the moving force behind the misconduct in this case, depriving Harris of his rights

   under the United States Constitution.

   **WHEREFORE**, Harris prays for a judgment against Defendant CITY in a fair and just

amount sufficient to compensate him for his damages, injunctive and declaratory relief, as well as

such other relief as is just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Respectfully submitted,

KALKEYLIUSS HARRIS, Plaintiff

By: /s Torreya L. Hamilton
    Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC
53 West Jackson Boulevard, Suite 452
Chicago, Illinois 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Attorney No. 6229397